**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**WHEELING**

**DEBORAH KENNEY,**

        **Plaintiff,**

**v.**                                      **Civil Action No.: 5:11-CV-29**
                                               **JUDGE STAMP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

        **Defendant.**

**REPORT AND RECOMMENDATION TO THE DISTRICT JUDGE RECOMMENDING THAT THE DISTRICT COURT DENY PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [17], GRANT DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [18], AND AFFIRM THE RULING OF THE COMMISSIONER**

## I.  INTRODUCTION

On February 22, 2011, Plaintiff Deborah Kenney ("Plaintiff") filed a pro se complaint in this

Court to obtain judicial review of the final decision of Defendant Michael J. Astrue, Commissioner

of Social Security ("Commissioner" or "Defendant"), pursuant to Section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g). (Complaint, ECF No. 1)  On May 2, 2011, the

Commissioner, by counsel Helen Campbell Altmeyer, Assistant United States Attorney, filed an

answer and the administrative record of the proceedings. (Answer, ECF No. 9; Administrative

Record, ECF No. 10)  On June 22, 2011, and July 21, 2011, the Plaintiff and the Commissioner filed

their respective Motions for Summary Judgment. (Pl.'s Mot. for Summ. J., ECF No. 17; Def.'s Mot.

for Summ. J., ECF No. 18)  Following review of the motions by the parties and the administrative record, the undersigned Magistrate Judge now issues this Report and Recommendation to the District Judge.

## II.  BACKGROUND

A.    Procedural History

On May 10, 2007, the Plaintiff protectively filed a Title II claim for disability insurance benefits ("DIB") and a Title XVI claim for supplemental security income ("SSI"), alleging disability beginning May 30, 2005.  (R. at 132-144)  Both claims were initially denied on October 31, 2007, and denied again upon reconsideration on April 4, 2008.  (R. at 62-65)  On May 21, 2008, the Plaintiff filed a written request for a hearing, which was held before United States Administrative Law Judge ("ALJ") Timothy C. Pace on September 17, 2009, in Cumberland, Maryland.  (R. at 35-61, 88-89)  The Plaintiff, represented by counsel George B. Levasseur, Jr., Esq., appeared and testified, and James Ryan, an impartial vocational expert, also appeared and testified at the hearing.  (R. at 35-61)  At that hearing, the Plaintiff amended her alleged onset date to February 21, 2006.  (R. at 11)  On October 16, 2009, the ALJ issued an unfavorable decision to the Plaintiff, finding that she was not disabled within the meaning of the Social Security Act.  (R. at 8-21)  On December 27, 2010, the Appeals Council denied the Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner.  (R. at 1-5)  The Plaintiff now requests judicial review of the ALJ's decision denying her application for disability.

B.    Personal History

Deborah Kenney was born July 26, 1955, and was 51 years old at the time she filed her DIB and SSI claims.  (R. at 132)  She completed 2 years of college, and has prior work experience as a certified living assistant, artist, and telemarketer.  (R. at 176, 180)  She is married to Clifford Kenney, and although she does not have any dependent children she listed an adult daughter, Nicole Rhodes, as a contact in her disability report.  (R. at 133, 174)

C.    Medical History

1.    Medical History Pre-Dating the Amended Alleged Onset Date of February 21, 2006

The Plaintiff visited the emergency room on January 26, 2004, for a toothache.  (R. at 304)  She was prescribed clindamycin and ordered to see a dentist.  Id.

On April 15, 2004, the Plaintiff was treated in the emergency room for chest pains.  (R. at 301)  The Plaintiff stated that she had been prescribed Lipitor, Prevacid, blood pressure medication, Glucophage, Neurontin, and Klonopin, but was not taking them because she could not afford them.  Id.  A chest X-Ray was given which was normal, and the Plaintiff admitted to improvement of her symptoms during her time at the hospital.  (R. at 302)  She was diagnosed with chest pain and discharged to home in stable condition.  Id.

The Plaintiff was given a chest X-Ray on May 15, 2004, that showed clear lungs, no pleural fluid, and normal heart and pulmonary vessels.  (R. at 337)

The Plaintiff was admitted to the emergency room on August 21, 2004, for a suicide attempt after consuming alcohol and approximately 30 pills of Xanax.  (R. at 299)  She was given oxygen

and voluntarily accepted 50 grams of charcoal for treatment.  (R. at 300)

On March 13, 2005, the Plaintiff visited the ER for a bite sustained while caring for a patient at Ray of Hope, at which the Plaintiff was working at the time.  (R. at 297)  Upon examination, the Plaintiff displayed no tenderness in the biceps or triceps, was able to flex and extend her elbow, and pronate and supinate without difficulty.  (R. at 297-98)  An X-Ray of her right humerous showed no fracture or dislocation and unremarkable periarticular soft tissues.  (R. at 335)  X-Rays of her right shoulder showed calcific tendinopathy in the supraspinatus tendon but no evidence of acute abnormality and no evidence of a fracture or dislocation.  (R. at 336)  She was diagnosed with a bite to the arm and shoulder muscle strain, and was ordered to follow up with her regular physician.  (R. at 298)

A chest X-Ray taken on April 11, 2005, and compared to a previous X-Ray taken on May 15, 2004, showed that the cardiomediastinal silhouette was stable, the lungs were clear, there was no pleural fluid, and the osseous structures were intact.  (R. at 333)  There was no evidence of acute cardiopulmonary disease.  Id.

A CT scan of the Plaintiff's brain was taken on April 11, 2005, which showed no acute intracranial process but mild right maxillar and ethmoid sinus disease.  (R. at 334)

The Plaintiff was admitted to the hospital on April 12, 2005, for pain, numbness, and weakness in her left arm.  (R. at 294)  She complained of chest heaviness but denied nausea, vomiting, diarrhea, and constipation.  Id.  She did report an anxiety disorder but denied depression.  Id.  Dr. Chotani found that the Plaintiff's heart had a regular rhythm with no murmurs or gallop.  (R.

at 295) She had decreased range of motion in the left upper extremity, and was unable to lift her arm all the way up due to pain. Id. She also had decreased grip, with 4/5 power in the left hand. Id. She also reported some numbness near the deltoid muscle. Id. The Plaintiff was diagnosed with left arm weakness, pain, and numbness of an unclear etiology, uncontrolled diabetes mellitus, hypertension, COPD, coronary artery disease, hypercholesterolemia, diabetic neuropathy, and an anxiety disorder. (R. at 296) Dr. Choatni recommended she be admitted to the hospital and that she begin a regimen of Accupril 10 mg / daily, Neurontin 900 mg /3x per day, Flexeril 10 mg / daily, and aspirin once per day. Id. He recommended an MRI of the neck, a nerve conduction study, and an EMG as an outpatient, as well as diabetic teaching and a prescription of Lantus, 10 units per night. Id. Additionally, the Plaintiff was prescribed Ambien 5 mg at night and Lexapro 10 mg / daily for her anxiety and Darvocet for pain. Id.

Dr. Janjua evaluated the Plaintiff on April 12, 2005, for a neurological consultation. (R. at 291-93) The Plaintiff had mild grip weakness in the left hand, grade 4/5. (R. at 292) She had limitation of left shoulder abduction and external rotation caused by pain. Id. She had diminished pin prick perception on the tip of the left shoulder. Id. Dr. Janjua diagnosed the Plaintiff with left shoulder and arm pain and numbness along with weakness. Id. He suspected entrapment neuropahty or possibly cervical radiculopathy or brachial plexopathy. Id.

An ultrasound of the carotid duplex was taken on April 12, 2005, which showed left-sided plaque but no stenosis. (R. at 329)

An MRI of the Plaintiff's left shoulder, taken on April 13, 2005, showed mild left AC joint degenerative change but the rest of the shoulder was normal with no evidence of rotator cuff tear.

(R. at 330)  An MRI of the Plaintiff's cervical spine showed small central disc protrusion at C4-C5, C5-C6, and C6-C7 with mild spinal stenosis.  (R. at 331)

The Plaintiff underwent an electromyogram on April 14, 2005, to determine if the parasthesia in her upper extremities was related to either entrapment neuropathy or cervical radiculopathy.  (R. at 283-84)  The results of the study indicated left carpal tunnel syndrome of mild to moderate severity.  (R. at 284)  No electromyogram abnormality to correlate with cervical radiculopathy was noted.  Id.

On April 14, 2005, the Plaintiff was evaluated by Dr. Ashker for left hand weakness and left arm numbness.  (R. at 288-90)  She informed Dr. Ashker that she woke up five days earlier with numbness and weakness in the hand, and that she was unable to grip a glass of water with her hand.  (R. at 288)  She had some discomfort in the left shoulder but no neck pain.  Id.  She stated that she had not had any trauma, attempted to lift any furniture, or slipped on her left arm.  (R. at 289)  Upon examination, her neck range of motion was normal, as were her flexion and extension and lateral rotation.  Id.  She had some difficulty with both passive and active movement of her left shoulder, but seemed to have normal strength in her deltoid muscle.  Id.  Her grip was weak, but her finger abduction and adduction were normal.  Id.  She had diminished reflexes in her left biceps and triceps, but her sensation to pinprick was normal.  Id.  Dr. Ashker determined that an MRI of the Plaintiff's cervical spine showed multiple disk degeneration and small disk bulge/herniation at C4-C5, C5-C6, and C6-C7, but that none of it was significant enough to explain her symptoms.  (R. at 290)  Dr. Ashker diagnosed her with a possible left brachial plexopathy, possible peripheral neuropathy including an element of carpal tunnel syndrome, and possible transient ischemic attack

although the symptoms and complaints were nonspecific.  Id.  He recommended conservative therapy because the Plaintiff reported that her symptoms had improved over the previous few days. Id.

The Plaintiff was discharged from Western Maryland Health System hospital on April 14, 2005.  (R. at 285-87)  The Plaintiff was originally admitted on April 12, 2005, for pain, weakness, and numbness in the left upper extremity.  (R. at 285-86)  She was found to have uncontrolled diabetes and placed on Lantus.  (R. at 286)  She was diagnosed with transient ischemic attack/mononeuropathy multiplex, cervical radiculopathy, uncontrolled diabetes mellitus, hypertension, chronic obstructive pulmonary disease, coronary artery disease, hypercholesterolemia, diabetic nephropathy, and anxiety.  (R. at 285)

2.      Medical History Post-Dating the Amended Alleged Onset Date of February 21, 2006

The Plaintiff visited Hyndman Health Center on February 21, 2006, as a new patient.  (R. at 351)  She had been out of medication for 4-5 months due to losing her insurance.  Id.  She complained of pain in her legs, and stated that she took Percocet at night because Neurontin did not help.  Id.

The Plaintiff went to Hyndman Health Center on February 28, 2006, for a followup.  (R. at 354)  She took too much insulin and experienced slurred speech; she called in to report her symptoms and was advised to visit the emergency room, but she did not do so.  Id.

On March 7, 2006, the Plaintiff visited Hyndman Health Center for a followup.  (R. at 355-56)  She received instruction on the use of Lantus for her diabetes.  Id.

The Plaintiff visited Hyndman Health Center on March 24, 2006, for a followup on her

diabetes, hypertension, urinary incontinence, and insomnia. (R. at 357) The physician's note indicates that the Plaintiff needed lots of medication refills but was not on insurance. Id.

On March 29, 2006, the Plaintiff visited Hyndman Health Center for a followup. (R. at 358) She mainly wanted to get materials for her diabetes, such as a blood sugar machine and strips. Id. The Plaintiff was given "as many samples as possible today, and will give samples at next visit and from time to time." Id.

On April 20, 2006, the Plaintiff was treated for chronic leg pain, neuropathy, insomnia, and a sore throat. (R. at 359) She was given Ambien CR samples to help with the pain and insomnia, and advised to gargle with salt water to help with the sore throat. Id.

A blood test ordered by Dr. Khan at Hyndman Health Center on June 19, 2006, showed the Plaintiff's glucose control index to be 7.7%, within the "good control" level of the index. (R. at 391)

The Plaintiff was admitted to the emergency department of Western Maryland Health System on June 21, 2006, with complaints of chest pain. (R. at 277-80) She described the pain as dull and pressure-like, 5/10 intensity, located retrosternal and radiating up her neck and along both arms. (R. at 277) The Plaintiff was 5'7" and weighed 248 pounds. (R. at 278) Her blood pressure was 120/68 with a repeat reading of 185/42, her pulse was 87, and her respiration was 20. Id. She complained of leg pains, which appeared to be related to diabetic neuropathy. Id. She was diagnosed with an unstable angina and admitted to a monitored bed. (R. at 279) She was ruled out for a myocardial infarction by a cardiology consultant, who recommended cardiac catheterization to further evaluate areas of stenosis on the left ventricular coronary artery that were discovered in 2003. Id.

On June 21, 2006, the Plaintiff was evaluated for a consultation on chest pain to rule out a

myocardial infarction. (R. at 281-82) She was determined to have an unstable angina, and was recommended for cardiac catheterization for evaluation of the area of the stenosis observed in her coronary artery in 2003. (R. at 282) Ultrasound images showed no evidence of DVT in the right venous duplex. (R. at 328) A chest X-Ray taken on that date showed that the heart, vascular structures, and mediastinum were normal; the lungs were clear; and there had been no interval changes since a previous X-Ray on April 8, 2006. (R. at 327)

The Plaintiff underwent diagnostic cardiac catheterization on June 22, 2006, which revealed a 70-80% stenosis in the mid LAD, long segment 70-80% stenosis in the mid RCA, and left ventricular ejection fraction of 70%. (R. at 309 408-410) PCTI and implanatation of stents in the mid LAD lesion and mid RCA lesions were then performed. (R. at 310, 412-14) Non-drug eluting stents were used because the Plaintiff stated she could not take long-term medications due to their cost. Id. Plavix therapy was limited to two to four weeks. (R. at 310-11, 413-14)

An MRI of the Plaintiff's lumbar spine was performed on June 23, 2006, to help diagnose severe bilateral back and leg pain. (R. at 326) The vertebral bodies were normal in statute and alignment, and the interspaces were well maintained. Id. No definite disc herniation or spinal canal stenosis was noted, and there was no fracture subluxation or other abnormality. (R. at 326) However, there were mild changes of lumbar spondylosis. Id.

A hospital discharge summary dated June 23, 2006, states that the Plaintiff suffered from an unstable angina that had resolved, chronic low back pain, diabetes mellitus, obesity, and tobacco addiction. (R. at 274) A cardiac catheterization with angioplasty and stent placement in the left anterior descending artery was performed during the hospitalization. (R. at 274) The Plaintiff

complained of lower back pain and neuropathic pain during her hospitalization, so an MRI of the lumbosacral spine was obtained which showed normal results.  (R. at 275)  Upon discharge, the Plaintiff was taking the following medications:

1. Nitroglycerin 0.4 mg sublingual as needed for chest pain;
2. Ocean nasal spray as needed;
3. Plavix 75 mg by mouth daily;
4. Protonix 40 mg by mouth daily;
5. Roxicodone 5 mg by mouth every 4 hours as needed for severe pain;
6. Multiple vitamins daily;
7. Colace 100 mg twice a day as needed;
8. Enteric coated baby aspirin 81 mg daily;
9. Lopressor 50 mg by mouth twice per day;
10. Klonopin 1 mg three times per day;
11. Lyrica 75 mg by mouth twice per day;
12. Lantus insulin 32 units subcutaneously in the evening;
13. Oral diabetes medicine of an unknown name and dosage;
14. Lisinopril 20 mg by mouth daily;
15. Flexeril 10 mg by mouth daily; and
16. Ambien 10 mg by mouth at bedtime as needed.

Id.  She was given a supply of all of her medications except Roxicodone, Protonix, Plavix, and Lopressor, of which she was prescribed a one month's supply.  Id.  Her condition upon discharge was good.  Id.

On June 30, 2006, the Plaintiff visited Hyndman Health Center with complaints of exertional neck pain.  (R. at 364)  Dr. Khan noted that the Plaintiff just had two stents put in.  Plaintiff was given samples of Plavis, but was refused Percocet for her back pain – she would have to wait until her next appointment.  Id.  The Plaintiff's other medical problems were stable.

A portable chest film taken on July 24, 2006, was negative for acute cardiopulmonary disease.  (R. at 325)  The heart, lungs, mediastinum, and pleural spaces were normal.  Id.

The Plaintiff visited Dr. Khanna on July 31, 2006, for chest pain.  (R. at 266)  She was given morphine, sublingual nitroglycerine, and aspirin.  (R. at 267)  A chest film taken on that date showed a stable cardiomediastinal silhouette, clear lungs with no pleural fluid, and intact osseous structures.  (R. at 324)

The Plaintiff was given a physical examination on July 31, 2006.  (R. at 270-72)  Dr. Khan noted that the Plaintiff had a 20 year history of insulin-dependant diabetes and diabetic neuropathy.  (R. at 270)  She also suffered from heart problems, including hypertension, hypercholesterolemia, and a history of catheterization.  Id.  Dr. Khan also noted that she had a history of bipolar disorder with anxiety symptoms.  (R. at 272)  The Plaintiff was admitted to high level care, and was advised to continue her outpatient medications, resume ACE inhibitor and beta blocker, and begin sliding scale insulin.  Id.

A consultation note from Dr. Kulkarni, dated July 31, 2006, states that the Plaintiff was suffering from sharp intermittent chest pains and occasional chest heaviness and pressure.  (R. at 263)  Dr. Kulkarni observed that the Plaintiff was moderately obese, with a blood pressure of 130/80, pulse of 70, and respiratory rate of 18.  (R. at 264)  Dr. Kulkari assessed the Plaintiff's chest pain as being somewhat atypical for angina, and suggested that she continue aspirin therapy indefinitely and Plavix therapy for 2 weeks.  Id.  There was no objective evidence for any ischemia or cardiac injury.  Id.  Dr. Kulkari recommended that the Plaintiff obtain a persantine cardiolite stress test as an outpatient.  Id.

A hospital discharge summary dated July 31, 2006, states that the Plaintiff, after being admitted to the hospital for chest pain, was discharged with stable vital signs and no pain.  (R. at

268)  She was advised to maintain a 2-gram sodium, low-fat, 1800 calorie American Diabetic Association diet, to stop smoking, and to control her diabetes.  (R. at 268-69)

On August 8, 2006, the Plaintiff underwent a persantine cardiolite stress test.  (R. at 307)  The stress test results were abnormal; although the EKG monitoring did not show abnormalities, the Plaintiff demonstrated ischemic perfusion abnormalities in the inferior and apical regions.  Id.  She also experienced chest discomfort, dyspnea, nausea, and headache related to the persantine infusion.  Id.  The Plaintiff also underwent a myocardial scan on August 8, 2006, finding minimal decreased perfusion in the inferior wall and apical regions, which was stress-related and reversible.  (R. at 323, 406)

The Plaintiff visited Dr. Khan at Hyndman Health Center on September 12, 2006, requesting medication because she did not have insurance.  (R. at 369)  Dr. Khan noted that her medical conditions were at baseline.  Id.

Dr. Khan evaluated the Plaintiff on October 13, 2006, for complaints of cramps from fibromyalgia.  (R. at 371-72)  The Plaintiff requested medication because she did not have insurance.  Id.

On October 26, 2006, the Plaintiff was brought to the hospital by a family member due to high blood pressure and high blood sugar.  (R. at 260-61)  Her blood pressure at home was reported to be 180/112 before taking her medication, and her blood sugar was 400 at noon.  Id.  A chest X-Ray showed no active cardiopulmonary disease.  (R. at 321, 404)  A CT scan of the brain was negative for acute change.  (R. at 322, 405)  The Plaintiff refused bloodwork despite being offered additional workup to determine her condition and despite being advised that death or disability may

result from refusing further treatment.  (R. at 261)

A blood test from February 2, 2007, showed a glucose control index level of 8.4, which falls into the "action suggested" abnormal range.  (R. at 389)

X-Rays of the Plaintiff's lumbar spine, taken on February 7, 2007, showed no compression fractures, no spondylolisthesis, and only mild diffuse degenerative disc changes.  (R. at 401)  No acute abnormalities were found.  Id.

X-Rays of the Plaintiff's cervical spine, taken on February 12, 2007, showed narrowing of the disc spaces at C4-5 and C6-7 that was associated with osteophytosis.  (R. at 317, 399)  Severe degenerative changes of the lower cervical spine with multilevel degenerative disc disease, prominent marginal osteophytosis, and mild neural foraminal stenosis were observed.  (R. at 317, 399)  X-Rays of the Plaintiff's thoracic spine, also taken on February 12, 2007, showed moderate degenerative disc change throughout the lower half of the thoracic spine, and X-Rays of the lumbar spine showed mild diffuse degenerative disc change.  (R. at 318-19, 400)

The Plaintiff visited the emergency room on March 22, 2007, complaining of pain in her right leg.  (R. at 258)  She reported not being able to bear weight on her right leg and not being able to go up stairs.  Id.  The pain was concentrated mostly in her right knee, and any time that she twisted her leg or tried to bear weight it would hurt.  Id.  She denied any injury to the knee.  Id.  Dr. Briggs, the examining physician, noted some erythema of the right anterior thigh and some tenderness, but noted that the tenderness was surrounding the patella itself and seemed to be located in the patellar tendon.  (R. at 259)  She had some small effusion to the joint and decreased sensation bilaterally, but full range of motion without crepitus, the ligaments all appeared intact, and she had

good pulses.  Id.  Ultrasound and X-Ray scans of the knee were negative.  Id.  Dr. Briggs diagnosed her with tendinitis and a right knee strain, and recommended elevation and ice, crutches, and Anaprox DS.  Id.

X-Rays taken on March 22, 2007, showed no fracture or dislocation, but indicated mild changes due to degenerative osteoarthritis.  (R. at 315, 396)

An ultrasound of the Plaintiff's right duplex extremity veins performed on March 22, 2007, showed normal augmentation and compression without any thrombus and no evidence of DVT.  (R. at 316, 397)

On June 14, 2007, the Plaintiff underwent an MRI on her right knee due to pain and limited range of motion.  (R. at 347, 394-95)  The medial and lateral menisci were intact without any definite tear, and the anterior and posterior cruciate ligaments were intact.  (R. at 347)  A moderate to large knee joint effusion with mild osteoarthritic change was noted in the tibiofemoral compartments.  Id.  There were small amounts of edema adjacent to the lateral collateral ligament and lateral patellar retinaculum.  Id.

On October 8, 2007, the Plaintiff was given a mental status examination by Tracy Cosner-Shepherd, a licensed psychologist, by request of the West Virginia Disability Determination Service. (R. at 415-21) The Plaintiff's subjective symptoms were poor memory, bipolar disorder, depression, aggressiveness, easily emotional, anxiety, feelings of being overwhelmed, feelings of wanting to pick up and leave, tendency to throw things when upset, difficulty sleeping without medication, weight gain, crying episodes, poor energy, uneasy around new people and crowds, impaired concentration, lack of interest or motivation, tendency to steal things for a high, history of binge

drinking, and history of psychiatric hospitalization due to a suicide attempt. (R. at 419) Ms. Cosner-Shepherd's objective findings were a mood disturbance with history of depression, poor coping skills with history of binge drinking, history of mental health treatment, history of some vocational dysfunction, some family dysfunction with history of abuse, some legal difficulties, impaired memory, impaired concentration skills, and impaired judgment. Id. Her social functioning was observed as being mildly deficient to within normal limits due to good eye contact, appropriate responses, neutral mood, and broad affect. (R. at 420) Her concentration was moderately deficient due to her ability to calculate serial threes. Id. Her persistence and immediate memory were within normal limits, her pace was mildly slow and her remote memory mildly deficient, and her recent memory was moderately deficient. Id.

Dr. Frank Roman, a state agency psychiatric consultant, competed a psychiatric review technique form on October 16, 2007, finding that the Plaintiff suffered from a 12.04 Affective Disorder and 12.06 Anxiety-Related Disorder but that neither of those impairments were severe. (R. at 424) The Plaintiff's affective disorder was characterized as a mood disorder that did not precisely satisfy the diagnostic criteria; her anxiety-related disorder was characterized as a generalized anxiety accompanied by motor tension and persistent irrational fear. (R. at 427, 429) Dr. Roman, in rating the "B" criteria of Listings 12.04 and 12.06, determined that the Plaintiff suffered from only mild limitations and had no episodes of decompensation. (R. at 434) Dr. Roman also determined that the evidence did not establish the presence of the "C" criteria for either Listing 12.04 or 12.06. (R. at 435) Dr. Roman, based on the medical evidence of record, found the Plaintiff generally credible and that her social and CPP skills were mildly impaired. (R. at 436) However,

Dr. Roman found that she was independent in her ADLs and appeared to be able to follow routine work duties in a low stress setting. Id.

On October 25, 2007, Dr. Fulvio Franyutti, a state agency medical consultant, completed a physical residual functional capacity ("RFC") assessment form. (R. at 439-46) Dr. Franyutti determined the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand/walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation. (R. at 440) She could occasionally climb ramps/stairs, balance, stoop, and crawl; but could never climb ladders/rope/scaffolds, kneel, or crouch. (R. at 441) She had no manipulative, visual, or communicative limitations. (R. at 442-43) She had to avoid concentrated exposure to extreme cold, vibration, and fumes/odors/dusts/gasses; and avoid even moderate exposure to hazards. (R. at 443) Dr. Franyutti found the Plaintiff partially credible because her allegations were only partially supported by his findings. (R. at 444) Dr. Franyutti noted some personal care problems in the Plaintiff's activities of daily living. (R. at 446)

A case analysis form dated February 29, 2008, and signed by Dr. Bartee, a state agency psychological consultant, states that the psychiatric review technique form dated 10/16/2007 is affirmed as written because it is more consistent with the Plaintiff's daily activities. (R. at 455)

On March 6, 2008, Dr. Monderewicz, a state agency medical consultant, conducted an internal medicine examination of the Plaintiff. (R. at 458-64) The Plaintiff complained of shortness of breath, cough, and wheezing, but no hemoptysis; chest pain; leg pain and swelling; and nausea and vomiting. (R. at 461) The Plaintiff was 5'0" tall, weighed 250 pounds, and had a BMI of 49. Id. Her blood pressure was 146/88. Id. She walked with a mild left limp but did not require the use

of a handheld assistive device, and she appeared stable at station and comfortable in the sitting position; however, she was uncomfortable in the supine position due to increase leg pain and difficulty arising from the exam table.  Id.  The Plaintiff's heart had a regular rhythm and rate and there were no murmurs.  (R. at 462)  The Plaintiff's upper extremity strength was normal.  Id.  The Plaintiff had left knee tenderness over the medial joint line.  Id.  There was no tenderness over the cervical spine, but she did have tenderness over the lumbar spine at L5-S1.  Id.  Range of motion testing revealed some limitations.  (See R. at 465-66)  Dr. Monderewicz concluded that the Plaintiff's ability to stand, walk, squat, kneel, and crawl were limited by probable osteoarthritis of the left knee, and that her lifting and carrying would be limited by an inability to fully squat and some lower back problems.  (R. at 463)  No limitation was found in the Plaintiff's ability to sit, handle objects with fine manipulation, hear, or speak.  (R. at 464)

On March 29, 2008, Dr. Reddy, a state agency medical consultant, completed a physical residual functional capacity evaluation form for the Plaintiff's claim.  (R. at 468-75)  Dr. Reddy found that the Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand at least 2 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday, and push/pull without limitation.  (R. at 469)  Specifically, Dr. Reddy found the Plaintiff able to walk/stand for about 3-4 hours in an 8-hour work period.  Id.  The Plaintiff had occasional postural limitations and no manipulative, visual, or communicative limitations.  (R. at 471-72)  The Plaintiff could have unlimited exposure to wetness, humidity, and noise; needed to avoid concentrated exposure to extreme cold, vibration, and fumes/odors/dusts/gasses; and needed to avoid even moderate exposure to extreme heat and hazards.  (R. at 472)  Dr. Reddy found the medical and non-medical evidence

credible and supported by a limping gait, some restricted range of motion, some decreased strength, joint tenderness, balance difficulties, abnormal MRI scans, and a history of heart problems. (R. at 473) The Plaintiff's symptoms were consistent with questionnaires indicating restricted activities of daily living due to pain, partially relieved by medication with side effects. Id. Dr. Reddy noted that the Plaintiffs allegations were all credible with some supporting medical evidence, but that none of her conditions were disabling – she was on medication as needed, her activities of daily living indicated some light work and some exaggerated limitations, and she used a cane as needed. Id.

Dr. Lee of Braddock Medical Group examined the Plaintiff on May 8, 2009, for an initial visit to establish a doctor. (R. at 499-502) The Plaintiff complained that she had many medical problems and takes lots of medication, but that she currently was suffering from anxiety and had been taking Xanax. (R. at 499) Dr. Lee observed that the Plaintiff had no heart murmurs or gallups, no edema, and her peripheral pulses were intact. (R. at 500) She was not in any respiratory distress and her breathing was clear. Id. She had normal mobility of the spine and no deformities, full range of motion in her extremities with no deformities, and normal station and gait. Id. She was oriented to all spheres and her affect and mood were appropriate. Id. Dr. Lee assessed the Plaintiff with benign hypertension, diabetic peripheral neuropathy, an unspecified bipolar disorder, and insulin-dependent diabetes. (R. at 501) He prescribed Xanax, Cymbalta, and Enalapril Maleate and directed the Plaintiff to return in one month for a checkup. Id.

The Plaintiff visited Dr. Lee on June 15, 2009, for a followup on her anxiety and to get medicine for her neuropathy. (R. at 503-06) Dr. Lee diagnosed the Plaintiff with anxiety and insomnia and prescribed Ambien and Lyrica to help with the neuropathy and sleep disorder. (R. at

504-05)

On June 22, 2009, the Plaintiff visited Dr. Lee for a followup on her neuropathy. (R. at 507-09) He also diagnosed her with rhinitis and prescribed Ultracet and Nasacort to help with the pain and nasal condition. (R. at 508-09)

On July 9, 2009, the Plaintiff visited Dr. Lee for a refill of her Xanax. (R. at 509)

The Plaintiff's left foot was X-Rayed at the Emergency Room on August 8, 2009, which revealed calcaneal spurs. (R. at 513)

The Plaintiff was admitted to the hospital on February 6, 2010, because she was confused, drowsy, and vomiting while visiting her mother at the hospital. (R. at 523) She was admitted for overnight monitoring of a suspected drug reaction from her pain medication and benzodiazepines combined with an uncontrolled blood glucose level. (R. at 524) She was also diagnosed with uncontrolled diabetes, questionable history of coronary artery disease, well-controlled hypertension, and chronic lower back pain. (R. at 525) A chest X-Ray showed low lung volume but no active cardiopulmonary disease. (R. at 531) A spinal X-Ray, taken on February 7, 2007, to rule out stenosis revealed no acute osseous abnormality but degenerative spondylosis. (R. at 529) A carotid sonogram taken on February 7, 2010, showed increased flow velocity within the left ICA, suggesting stenosis between 50-69%. (R. at 536) The sonogram also indicated a nodule within the right neck suggesting an enlarged lymph node that should be evaluated by CT scan. Id. A neck CT scan showed prominent bilateral lymph nodes in the neck but no signs of lymphadenopathy. (R. at 538) An MRI of the lumbar spine showed mild changes of lumbar spondylosis, mild degenerative changes, and mild spinal canal stenosis at the L4-L5 interspace. (R. at 540) The spinal findings

were noted to be relatively unchanged since a prior exam from June 2006. Id. An EEG conducted on February 8, 2010, was normal. (R. at 542) A CT scan of the chest, taken on February 9, 2010, revealed a fatty liver. (R. at 543) The Plaintiff was discharged from the hospital on February 9, 2010, in stable condition with improved confusion and resolution of her altered mental status. (R. at 561)

E.     Testimonial Evidence

At the ALJ hearing held on September 17, 2009, the Plaintiff testified that she is married and lives at home with her husband and her 19-month-old granddaughter. (R. at 39) Her husband takes care of the granddaughter but the Plaintiff assists in watching her. Id. She can change the child's diapers but has trouble lifting her. (R. at 39, 44) If she has to babysit, the Plaintiff does not get down on the ground to play with the child but instead tries to get her to sit on the couch and watch cartoons. (R. at 58)

The Plaintiff suffers from peripheral neuropathy due to uncontrolled diabetes and has some peripheral damage to her extremities, resulting in numbness and tingling. (R. at 40) She also has kidney disease which developed due to her diabetes. (R. at 41) She puts out high levels of potassium and is worried about kidney failure. (R. at 56) When her blood sugar is high she has trouble seeing. (R. at 40) She has wounds that do not heal, including one on her foot that resulted in blood poisoning. (R. at 46) Her blood sugar runs up to around 300 during the day, which is not a good control level. (R. at 51)

The Plaintiff has coronary artery disease and has had two heart attacks. (R. at 41-42) She also claims to have had a stroke in 2007. (R. at 42) She had stents put in to help with the artery

problems.  (R. at 57, 59)  She takes blood pressure medication.  (R. at 59)

The Plaintiff rated her pain as being a 9 on a scale of 1-10, reduced to around an 8 if she takes Lyrica.  (R. at 43)

The Plaintiff can grasp a soda can and write a short letter, but she has difficulty cracking the ice out of an ice tray.  (R. at 44-45)  She cannot use a can opener.  (R. at 45)  She has dropped dishes while trying to empty the dishwasher.  Id.  She can shampoo her hair but cannot take a bath.  Id.  She can sometimes bend over to pick up clothes but it depends on her pain level.  Id.  She cannot drive a car due to high blood sugar and hypoglycemic attacks, which cause her to lose eyesight and get confused.  Id.  She also has trouble pushing the brake and gas pedals with her foot.  (R. at 46)  She used to paint, but cannot do so today because of cramps and shakes in her painting hand when she tries to hold a paint brush.  (R. at 47)  She can walk for 5-10 minutes but then needs to sit and rest her legs.  (R. at 55)

The Plaintiff stated that she could no longer work as a telemarketer because she has difficulty sitting and has to urinate constantly.  (R. at 41)  She has pain in her arms and hands that makes it difficult to type.  Id.  She has to stand up three times per hour due to leg swelling and tingling.  (R. at 42)  Portions of the hearing were inaudible and did not transcribe, but the Plaintiff also stated that she had trouble holding jobs and was continuously having problems with getting to work on time.  (R. at 49)  Additionally, she stated that her high blood sugars cause confusion and prevent her from focusing on her work.  (R. at 51)

F.      Vocational Evidence

Also testifying at the ALJ hearing was Dr. James Ryan, a vocational expert, who

characterized the Plaintiff's past work within a range of light and skilled to sedentary and semi-skilled. (R. at 48) The Plaintiff's work skills as an artist and as a certified nursing assistant were non-transferable. Id.

The Plaintiff's work as a telemarketer was semi-skilled. (R. at 50) Provided she stayed within her work space, the Plaintiff could stand or sit for as long as she wanted while performing the job. Id. Telemarketer positions require frequent data entry. Id. The transcript is illegible as to whether telemarketer skills are transferable. Id. Portions of the hypothetical posed to Dr. Ryan are illegible, as is the answer to the hypothetical. (See R. at 52) A second hypothetical with reduced limitations was also posed but is partially illegible; the answer to the hypothetical is also partially illegible. (R. at 53)

A report of contact form, dated October 30, 2007, details the Plaintiff's work as a telemarketer. (R. at 202) Her work involved 1 hour of standing, 1 hour of walking, and 7 hours of sitting. Id. She lifted no more than 10 pounds, and frequently lifted weight of less than 10 pounds. Id. She reached 1 hour per day and typed 6 hours per day. Id. Her work required no climbing, stooping, kneeling, crouching, crawling, or handling large objects. Id. She also did not supervise and was not a lead worker. Id.

G.      Lifestyle Evidence

On an undated, incomplete adult function report contained in the record, the Plaintiff stated that she spends her days by bathing, napping, eating meals, and watching television. (R. at 193) She requires her husband's help for most of these activities. Id.

A second adult function report, dated January 15, 2008, states that the Plaintiff also does

some house work by helping clean and folding laundry. (R. at 216) Twice a month she goes shopping for personal items and food. (R. at 219)

A daily activities questionnaire dated August 17, 2009, states that the Plaintiff does some light cleaning, washes dishes, and folds laundry once or twice a week. (R. at 516) She sometimes gets in her pool, will go shopping if she has access to a motor buggy, and goes to church once or twice a month. Id. She needs help doing these activities because she cannot walk very far. Id. She does not cook for herself, she needs assistance with washing herself and getting into and out of the bath tub. (R. at 517) She likes to watch television, and used to paint but does not do so any more. Id. She likes to read the newspaper every day. Id. She has daily interaction with family members. Id.

### III.  CONTENTIONS OF THE PARTIES

The Plaintiff, in her motion for summary judgment, alleges that the evidence of record establishes her disability as of February 21, 2006, and that the ALJ erred in finding that the Plaintiff is able to perform sedentary work, is capable of performing her past relevant work as a telemarketer, and that she is not disabled. (Pl.'s Mot. for Summ. J.1-2, ECF No. 17) Specifically, the Plaintiff asserts that the ALJ made the following errors requiring reversal:

•       The transcript of the ALJ hearing contains numerous inaudible portions which make it impossible to accurately determine the meaning and significance of the testimony from the hearing;

•       The ALJ did not permit the Plaintiff's counsel to present evidence at the hearing; and

•       The ALJ improperly weighed the Plaintiff's credibility.

(Mem. in Supp. of Pl.'s Mot. for Summ. J. 7-12, ECF No. 17-1)

The Defendant asserts that the ALJ's decision is supported by substantial evidence and should be affirmed as a matter of law.  (Def.'s Mot. for Summ. J. 1, ECF No. 18)  In support, the Defendant argues that:

•       The inaudible portions of the transcript do not affect the evidence relied upon by the ALJ to determined that the Plaintiff could perform her past relevant work;

•       There is no support in the record for the Plaintiff's assertion that her counsel was not allowed to question her or present evidence at the ALJ hearing; and

•       The ALJ properly found that the Plaintiff was not credible due to inconsistencies between her testimony and the medical evidence and her failure to cooperate with the hearing process and to comply with recommended treatment.

(Mem. in Supp. of Def.'s Mot. for Summ. J. 7-10, ECF No. 19)

## IV.  STANDARD OF REVIEW

The Fourth Circuit applies the following standards in reviewing the decision of an ALJ in a Social Security disability case:

> Judicial review of a final decision regarding disability benefits . . . is limited to determining whether the findings . . . are supported by substantial evidence and whether the correct law was applied.  See 42 U.S.C. § 405(g) ( "The findings . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . .");  Richardson v. Perales, 402 U.S. 389, 390, 91 S. Ct. 1420, 1422 (1971); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).  The phrase "supported by substantial evidence" means "such relevant evidence as a reasonable person might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401, 91 S. Ct. at 1427 (citing Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S. Ct. 206, 216 (1938)) . . . . If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."  Laws v. Celebrezze, 368

F.2d 640, 642 (4th Cir. 1966). Thus, it is not within the province of a reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment . . . if the decision is supported by substantial evidence. See Laws v. Celebrezze, 368 F.2d at 642; Snyder v. Ribicoff, 307 F.2d 518, 529 (4th Cir. 1962).

Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Because review is limited to whether substantial evidence supports the ALJ's conclusion, "[t]his Court does not find facts or try the case de novo when reviewing disability determinations." Seacrist v. Weinberger, 538 F.2d 1054, 1056-57 (4th Cir. 1976). Furthermore, **"the language of § 205(g) . . . requires that the court uphold the decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'"** Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (emphasis added).

## V. DISCUSSION

A.  Standard for Disability and the Five-Step Evaluation Process

To be disabled under the Social Security Act, a claimant must meet the following criteria:

An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work . . . . "[W]ork which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

See 42 U.S.C. § 423(d)(2)(A). The Social Security Administration uses the following five-step sequential evaluation process to determine if a claimant is disabled:

(i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

(ii) At the second step, we consider the medical severity of your impairment(s). If

you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

(iii) At the third step, we also consider the medical severity of your impairments(s). If you have an impairment(s) that meets or equals one of our listings . . . and meets the duration requirement, we will find that you are disabled.

[Before the fourth step, the residual functioning capacity of the claimant is evaluated based "on all the relevant medical and other evidence in your case record . . . ." 20 C.F.R. § 404.1520.]

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520. If the claimant is determined to be disabled or not disabled at any of the five steps, the process does not proceed to the next step. Id.

B.     The Decision of the Administrative Law Judge

Utilizing the five-step sequential evaluation process described above, the ALJ made the following findings:

**1.     The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.**

**2.     The claimant has not engaged in substantial gainful activity since February 21, 2006, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).**

**3.     The claimant has the following severe impairments: coronary artery disease, diabetes mellitus, hypertension, morbid obesity and**

degenerative disc disease of the spine (20 CFR 404.1520(c) and 416.920(c)).

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.      After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that the claimant would have to avoid exposure to heights or moving machinery, and she could not perform any kneeling, squatting or crawling.

6.      The claimant is capable of performing past relevant work as a telemarketer.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from February 21, 2006 through the date of this decision (20 CFR 404.1520(f)) and 416.920(f)).

(R. at 13-21)

C.      <u>The Inaudible Portions of the Transcript Are Immaterial to the ALJ's Decision</u>

As her first assignment of error, the Plaintiff argues that the numerous inaudible portions of the ALJ hearing transcript invalidate the ALJ's finding that the Plaintiff could perform her past relevant work as a telemarketer.  (Mem. in Supp. of Pl.'s Mot. for Summ. J. 7, ECF No. 17-1)  The Plaintiff points specifically at one passage of the transcript relating to the Plaintiff's telemarketing work, which she believes omits crucial evidence showing that she could not perform her past relevant work:

Q.      All right.  And the telemarketer?  (INAUDIBLE).

CLMT:       (INAUDIBLE)

ALJ:   On a regular basis.  Did you (INAUDIBLE)?

CLMT:      Yeah.

ALJ:   Okay.  All right.  Was there production standards associated with that?

CLMT:      I'm sorry, I didn't (INAUDIBLE).

ALJ:   Did you have to (INAUDIBLE) so many (INAUDIBLE) hours?

CLMT:      Yes.

(R. at 49)  The Plaintiff's objection, however, is harmless because the ALJ relied on other substantial evidence in the record to determine that the Plaintiff could perform her past relevant work as she actually performed it.

The Social Security Act states that the court "may, at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding. . . ."  See 42 U.S.C. § 405(g).  A lost or unintelligible hearing transcript would clearly provide good cause for remand if the evidence contained therein was material to the outcome of the decision:

> [T]here are sometimes procedural difficulties which prevent the Secretary from providing the court with a transcript of administrative proceedings.  Such a situation is an example of what could be considered "good cause" for remand.  Where, for example, the tape recording of claimant's oral hearing is lost or inaudible, or cannot otherwise be transcribed . . . good cause would exist to remand the claim to the Secretary for appropriate action to produce a record which the court may review . . . .

H.R. CONF. REP. NO. 944 at 59 (1980), reprinted in 1980 U.S.C.C.A.N. 1277, 1407.  However, the

lost or unintelligible transcript contents must have been the basis for the decision for remand to be appropriate. Compare Bianchi v. Sec'y of Health and Human Serv., 764 F.2d 44, 46 (1st Cir. 1985) (remand appropriate because the ALJ relied on the testimony of a medical advisor and that advisor's testimony was unintelligible in the transcript), with Drejka v. Comm'r of Soc. Sec., 61 Fed.Appx 778, 783-84 (3rd Cir. 2003) (remand inappropriate despite numerous inaudible sections of transcript because the ALJ relied on other portions of the VE's testimony and not upon the unintelligible portions).

Despite the fact that large portions of the transcript from the ALJ hearing are unintelligible, it is unnecessary to remand this matter on that basis because the ALJ relied on other evidence in the record in reaching his decision. The ALJ's opinion clearly cites Exhibit 7E -- a report of contact form dated October 30, 2007 -- as his basis for determining the function-by-function requirements of the Plaintiff's past relevant work as she actually performed it, and the ALJ also cites testimony from the vocational expert that was properly transcribed in the record. (See R. at 20) Accordingly, the undersigned finds that remanding this matter is inappropriate because the inaudible portions of the transcript do not affect this Court's ability to review the factual basis for the ALJ's decision.

D.       The ALJ Did Not Prevent the Plaintiff's Counsel from Presenting Evidence at the Hearing

The Plaintiff's second assignment of error is that the ALJ "failed to permit or allow counsel to present additional evidence which would have been material to the conclusions arrived at by the ALJ." (Mem. in Supp. of Pl.'s Mot. for Summ. J. 7, ECF No. 17-1) It is true that Procedural Due Process considerations are applicable to Social Security benefits hearings. See Richardson v. Perales, 402 U.S. 389, 401 (1971). However, the record fails to support the Plaintiff's contention

that her rights at the hearing were violated. The transcript of the ALJ hearing contains no indication that the Plaintiff planned or attempted to present evidence, pose questions directly to the Plaintiff, cross-examine the vocational expert, or present argument. The transcript also fails to indicate that the ALJ prevented the Plaintiff's counsel from participating in the hearing and the Plaintiff's counsel did not object to the manner in which the hearing was conducted. At the opening of the hearing, the ALJ specifically asked the Plaintiff's attorney if he had any objection to the entering of evidence in the record:

> ALJ: . . . As presently constituted, I have Exhibits 1A through 19F. 19F – oh, not much of an application there but it was received August 17th of 2009 consisting of four pages. Are we (INAUDIBLE)?
>
> ATTY: Yes, sir.
>
> ALJ: Any objection to these exhibits into the record?
>
> ATTY: No objection.

(R. at 37) At other various points during the hearing, the Plaintiff's attorney provided responses to questions posed by the ALJ and asked for clarification of the testimony, showing that he had ample opportunity to either lodge an objection or request an opportunity to present evidence. Furthermore, at the conclusion of the hearing the Plaintiff did not request an extension of time to submit additional evidence. Therefore, the undersigned finds that the Plaintiff has failed to show that the hearing procedures were inadequate.

E.     The ALJ's Credibility Determination is Supported by Substantial Evidence

As her third assignment of error, the Plaintiff argues that the ALJ improperly weighed her credibility. (Mem. in Supp. of Pl.'s Mot. for Summ. J. 7, ECF No. 17-1) The Plaintiff's objection

is without merit because the ALJ provided a sufficiently specific explanation of his findings.

At a minimum, the Social Security Act requires that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." SSR 96-7p, 1996 WL 374,186, at *2. "Because he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989-90 (4th Cir. 1984). This court has, therefore, determined that "[a]n ALJ's credibility determinations are 'virtually unreviewable' by this Court." Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D.W.Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D.W.Va. February 3, 2010) (Seibert, Mag.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

The ALJ discounted the Plaintiff's credibility for the following reasons: evidence of noncompliance with treatment, a lack of full cooperation in the disability process, a gap in the Plaintiff's treatment history, and discrepancies between her testimony and the medical evidence of record. First, the ALJ noted instances of noncompliance with treatment that were found in the record:

•        In February 2006, the Plaintiff, after taking too much insulin and experiencing slurred speech,[1] refused to go to the emergency room after being directed to do so; (R. at 353)

_____

[1] The ALJ's decision states that the Plaintiff experienced slurred speech, but the medical records actually indicate that she experienced blurred vision. (R. at 353)

- The Plaintiff initially refused hospitalization in July 2006, but returned the following week for admission; (R. at 270)

- In October 2006, the Plaintiff left the emergency room against medical advice; (R. at 260-61)

- In June 2007, the Plaintiff refused a stress test recommended by her physician; (R. at 385)

(R. at 18)  Second, the ALJ noted that the Plaintiff had not fully complied with the disability process, missing three consultative examinations without providing notice.  (R. at 18, 192, 201)  Third, there was a lengthy gap in the Plaintiff's treatment history, with no medical evidence from February 2008 through May 2009 and a no-show from an appointment in March 2008[2].  (R. at 18, 496)  Fourth, the ALJ noted discrepancies between the Plaintiff's testimony about the severity of her conditions and the medical evidence of record:

- In regard to the Plaintiff's coronary artery disease, there has been no documented problems with angina since having angioplasty and stent placement in June 2006;

- In regard to hypertension, there has been no documented strokes or ischemic attacks since the alleged onset of disability;

- There is no evidence in the record of renal problems within the disability period;

- There is little evidence of complications from the Plaintiff's diabetes;

- Little to no evidence exists documenting diabetic neuropathy other than Dr. Khan's

---

[2] The ALJ's decision lists a telephone record from Exhibit 17 or 18F that states that the Plaintiff no-showed for an appointment in March 2008.  The undersigned was unable to locate that particular note, but did discover a no-show from June 10, 2008, discussed in a telephone call placed June 20, 2008.  (R. at 496)

prescriptions of Lyrica, which is inconsistent with objective examination findings showing normal neurological functioning and appears to be based solely on the Plaintiff's subjective complaints and requests for medication.

(R. at 19) Having reviewed the record, the undersigned finds that the ALJ provided a sufficient explanation for discounting the Plaintiff's credibility. Furthermore, the undersigned cannot say that the ALJ's credibility determination is "patently wrong" – the repeated refusal of medical treatment, failure to appear for cost-free consultative examinations, and the lack of objective support for the Plaintiff's complaints tend to support the ALJ's determination that the Plaintiff was not entirely credible in describing her symptoms and pain. Accordingly, substantial evidence supports the ALJ's credibility determination.

## VI. RECOMMENDATION

For the reasons herein stated, I find that the Commissioner's decision denying the Plaintiff's application for Disability Insurance Benefits and Supplemental Security Income is supported by substantial evidence. Accordingly, I **RECOMMEND** that the Defendant's Motion for Summary Judgment (ECF No. 18) be **GRANTED**, the Plaintiff's Motion for Summary Judgment (ECF No. 17) be **DENIED**, and the decision of the Commissioner be affirmed and this case be **DISMISSED WITH PREJUDICE**.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States

District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984).

The Court directs the Clerk of the Court to provide a copy of this Report and Recommendation to all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia. Respectfully submitted this **26th** day of **August**, **2011**.


DAVID J. JOEL
UNITED STATES MAGISTRATE JUDGE